JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 8:24-01849 FWS (ADS) |
|---|---|
| Plaintiff, | |
| v. | MEMORANDUM OPINION GRANTING REQUEST FOR CERTIFICATION OF EXTRADITION |
| PRUDENCIO SEGURA CASTILLO, | |
| Defendant. | |

I.  **INTRODUCTION**

The United Mexican States ("Mexico") has requested the extradition of Prudencio Segura Castillo (the "Relator" or "Segura") pursuant to the Extradition Treaty between the United States of America ("United States") and Mexico (the "Treaty").[1] The charges in Mexico relate to an incident that allegedly occurred on February 24, 2020, at

---

[1] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, as amended by the Protocol to the Extradition Treaty Between the United States of America and the United Mexican

a family outing to a local lagoon. Relator, a U.S. resident, was visiting his wife and children in Iguala, Mexico. Relator is married to Jovita Santana Espinoza ("Jovita"). Jovita is sisters with Adela Santana Espinoza ("Adela"). Adela is the mother of the alleged minor victim, V.R.S. Relator is charged in Mexico with the crime of sexual abuse against V.R.S. stemming from allegations that he fondled V.R.S.'s vagina, while they were both swimming in the lagoon at the family gathering.

## II. PROCEDURAL HISTORY

On May 12, 2020, a Constitutional Rights Judge in Iguala de la Independencia, Guerrero, Mexico, authorized by Mexican law to issue warrants of arrest, issued a warrant for Relator's arrest for sexual abuse, in violation of Article 180 of the Guerrero Criminal Code. (Dkt. 27-2 at 6, 8, 31-51.) By judicial order dated June 27, 2022, the same judge determined the statute of limitations period for the alleged crime would expire on August 24, 2024. (Dkt. No. 29 at 31.) On June 9, 2023, Mexico submitted its formal extradition request (the "Extradition Request") and supporting documents to the United States pursuant to the Treaty. (Dkt. 27-2 at 5.) On July 8, 2024, in accordance with its Treaty obligations, the United States filed a Complaint for Arrest Warrant and Extradition. (USA v. Castillo, No. 2:24-mj-04053-ADS, Dkt. 1.) That day, a warrant was issued for Relator's arrest. (USA v. Castillo, No. 2:24-mj-04053-ADS, Dkt. 2.) On July 11, 2024, the United States Marshals Service (the "Marshals") arrested Relator in Westminster, California. (USA v. Castillo, No. 2:24-mj-04053-ADS, Dkt. 12.)

Relator initially appeared before this Court on July 11, 2024, and was temporarily detained, pending a detention hearing. (USA v. Castillo, No. 2:24-mj-04053-ADS, Dkt.

---

States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46 (1998) (collectively the "Treaty").

11.) On August 23, 2024, following additional briefing, the Court was prepared to hold a detention hearing, but took the matter off the calendar after the Marshals took Relator to the hospital. (Dkt. 26). The continued detention hearing was held on October 4, 2024. (Id.) The Court ordered Relator remain in detention until the extradition hearing scheduled for December 11, 2024. (Dkt. No. 35.) The parties stipulated to continue the extradition hearing to April 11, 2025. (Dkt. No. 36.) On April 11, 2025, the Court held the extradition hearing (the "Hearing"). (Dkt. No. 51.) Counsel for both parties were present and presented oral argument. At the end of the hearing, the Court took the matter under submission.

## III.  EVIDENCE

### A.  Evidence Presented By Requesting Country

The United States offers the information provided and authenticated by Mexico.

#### 1.  Statement of Alleged Victim

Mexico submitted a record of an interview V.R.S. gave to the Mexican prosecutor, while accompanied by her mother and with a psychologist present. (V.R.S. Interview, Dkt. No. 27-3 at 9-11.) V.R.S. stated that Relator is her uncle-in-law who traveled back and forth between the United States and Mexico and that Relator arrived in Mexico in January 2020. (Id. at 9.) V.R.S.'s declaration further states the following.

On February 24, 2020, the family, including V.R.S., V.R.S.'s mother Adela, Relator's wife Jovita, and Relator and V.R.S.'s cousins, went to Tuxpan Lagoon. (Id.) At about four o'clock in the afternoon, the family set up tables, chairs and everything needed for a family meal. (Id.) V.R.S. and her cousins went swimming in the lagoon. (Id. at 9-10.) Around five o'clock, Adela said they were going to prepare hamburgers, and Relator entered the lagoon to play with the children. (Id. at 10.) V.R.S. went away

from the other children to the deeper part of the lagoon, to avoid getting splashed. (Id.) The water was up to V.R.S.'s waist. (Id.)

Relator came close to V.R.S. and grabbed her leg under the water. (Id.) V.R.S. moved back but Relator was in front of her and put his right hand under her shorts. (Id.) Relator grabbed and fondled V.R.S.'s vagina. (Id.) V.R.S. was scared and could not move. (Id.) Relator removed his hand and told V.R.S. not to say anything, threatening that he would do something worse to her. (Id.) Relator went away and continued to play with his two sons as if nothing had happened. (Id.)

V.R.S. went to the shore with her cousins. (Id.) Her mother called her to eat but V.R.S. was not hungry and wanted to cry. (Id.) Everyone in the family left the lagoon and went home. (Id.) V.R.S. did not tell anyone about the incident until about a month later. (Id.)

On March 20, 2020, V.R.S. decided to tell her mother and father about the incident at the lagoon, after she saw a Facebook post from her sister, wherein her sister shared that she had been raped as a child. (Id.) V.R.S. called her father, who came to the home where V.R.S. and her mother live. (Id.) When her father arrived, V.R.S. told her mother and her father that Relator had touched her vagina on February 24th at the Tuxpan Lagoon. (Id.) V.R.S. no longer feared Relator's threats because he had already returned to the United States. (Id.)

Later, V.R.S.'s mother, Adela, asked V.R.S. to go see her Aunt Jovita, Relator's wife, and tell her what had happened. (Id.) V.R.S. told her Aunt Jovita and her grandmother that Relator had touched her vagina. (Id.) Jovita got mad and did not believe V.R.S. (Id.) Adela cried for several days until she brought V.R.S. to the prosecutor to make a complaint against Relator. (Id. at 11.)

### 2. Statement of Alleged Victim's Mother

The Extradition Request contains the statement Adela, V.R.S.'s mother, gave to the Mexican prosecutor under oath when she made the complaint regarding Relator. (Dkt. No. 27-3 at 18-20.) Adela stated the following.

Adela's sister is married to Relator. (Dkt. No. 27-3 at 18.) Relator arrived in Mexico at the end of January 2020. (Id.) On February 24, 2020, Adela went with her sister and Relator and their children to the Tuxpan Lagoon. (Id. at 18-19.) At 5 p.m., Adela saw that Relator got into the water. (Id. at 19.) When Adela saw that V.R.S. was at the lagoon shore, she told V.R.S. to eat. (Id.) V.R.S. replied that she was not hungry and got into the lagoon for a while longer. (Id.) Adela could see that V.R.S. was acting weird. (Id.)

On March 20, 2020, at around 10 a.m., Adela was at home when V.R.S.'s father arrived. (Id.) Adela, V.R.S. and her father, Mario, were in the living room together where V.R.S. told her parents that on February 24, 2020, Relator had touched her vagina at Tuxpan Lagoon. (Id.) V.R.S. told her parents that Relator was in the water in the deepest part and put his right hand under V.R.S.'s shorts and squeezed her vagina. (Id.) V.R.S. told them after that she came out of the water and went to shore with her little cousins. (Id.) V.R.S. told her parents that when Relator got out of the lagoon, she could go back in. (Id.) V.R.S. told her parents Relator had threatened her to stay silent about the incident, and she had not told them earlier because she was afraid. (Id. at 19-20.)

Afterwards, Adela took V.R.S. to Adela's mother's house and V.R.S. told Jovita about what had happened. (Id. at 20.) Jovita did not believe V.R.S. (Id.)

### 3. Statement of Alleged Victim's Father

Mexico submits a declaration from V.R.S.'s father, Mario, which states the following. On March 20, 2020, at about 9:30 a.m., Mario received a call from his daughter, V.R.S. (Dkt. No. 27-3 at 23.) V.R.S. was crying. (Id.) Mario went to the house, at approximately 10 a.m. (Id.) Mario, V.R.S. and V.R.S.'s mother sat together in the living room. (Id.) V.R.S. told her parents then about what happened on February 24, 2020, at the Tuxpan Lagoon. (Id.) V.R.S. told them that she had been in the water playing with her cousins, when Relator entered the water, approached her, took her leg under the water and touched her vagina with his right hand. (Id.) V.R.S. told her parents that Relator threatened her that if she said anything he was going to do more than simply touch her vagina. (Id.) V.R.S. told her parents that she did not eat at the family gathering. (Id.) V.R.S. told her parents she had not told them about the incident until then because she had been afraid of Relator's threats, but he had since returned to the United States. (Id.)

Adela asked V.R.S. who was close to V.R.S at the time and V.R.S. responded Santiago and Jesus were there, but they did not see what Relator had done. (Id.) Mario stated he was "really mad" and held his daughter in his arms. (Id.) Mario told Adela that he would back up any decision she made. (Id.) They decided to file a complaint against Relator with the Mexican public prosecutor. (Id.)

### 4. Psychological Report

Mexico submitted a psychological report (the "Psych Report") with its extradition request, which the United States filed under seal. (Dkt. No. 29 at 86-90.) A professionally licensed psychologist interviewed and evaluated V.R.S. and issued the report on May 6, 2020. (Id. at 86.) V.R.S.'s statement in the Psych Report states that

6

when she got back in the lagoon, her uncle also got in, approached her, pulled her by the shirt and touched her vagina. (Id. at 88.) The conclusion of the Psych Report states that V.R.S. presented emotional damage at the time of the evaluation. (Id. at 89.)

### 5.     Identification of Relator

Both of V.R.S.'s parents identified photos of Relator, under oath, as the person who committed the crime of sexual abuse against V.R.S. (Dkt. No. 27-3 at 28, 31.)

### B.     Evidence Proffered by Relator

Relator proffers eight declarations in opposition to the Request for Certification of Extradition. A relator may proffer explanatory evidence, but not contradictory evidence. See Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir. 1978) (evidence of facts contradicting the demanding country's proof or establishing a defense may properly be excluded); Santos v. Thomas, 830 F.3d 987, 992 (9th Cir. 2016) (en banc)(evidence that explains matters referred to by the witnesses for the government may be admitted, while evidence that merely contradicts the testimony for the prosecution may be excluded). The distinction is made because, among other reasons, the focus of the extradition hearing is on probable cause, not ultimate guilt. Explanatory evidence "'explains away or completely obliterates probable cause.'" Rana v. Jenkins, 113 F.4th 1058, 1070 (9th Cir. 2024) (quoting Santos, 830 F.3d at 992). Contradictory evidence merely controverts the existence of probable cause or raises a defense and is not admissible. See Mainero v. Gregg, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999) (superseded by statute on other grounds); Collins v. Loisel, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.") Contradictory evidence that would require a mini

trial to weigh credibility is not admissible in an extradition hearing.  See Charlton v. Kelly, 229 U.S. 447, 461 (1913) (An extradition "proceeding is not a trial."); Rana, 113 F.4th at 1071 (attacks on credibility do not obliterate probable cause and require "evaluations of credibility best left for trial.")

### 1. Declaration of Ana Laura Garcia Isodoro

Relator proffers the declaration of Ana Laura Garcia Isodoro.  (Dkt. No. 41 at 23.) Ms. Garcia Isodoro is married to Relator's step-son.  (Id.)  Ms. Garcia Isodoro attended the family outing at Tuxpan Lagoon in February 2020.  (Id.)  She declares that when everyone arrived at the lagoon, the adults unloaded the vehicles and Relator started cooking the food on a grill he brought with him.  (Id.)  Ms. Garcia Isodoro states that the children, including V.R.S., walked with her to the convenience store to get a snack and then to a nearby house to borrow a chair.  (Id.)  According to Ms. Garcia Isodoro, after those errands, the children, including V.R.S., went into the lagoon.  (Id.)  She states that when Relator finished cooking, V.R.S. and the other children got out of the water, and everyone ate together.  (Id.)  Ms. Garcia Isodoro states that after eating, the children and some adults, including Relator, Jovita and Adela went into the lagoon.  (Id.)  Ms. Garcia Isodoro declares that V.R.S. stayed close to the young children in the shallow water near the shoreline and Ms. Garcia Isodoro did not observe Relator near V.R.S. in the water. (Id. at 24.)

### 2. Declaration of Etelberta Martinez Santana

Ms. Martinez Santana is Relator's stepdaughter.  (Dkt. No. 41 at 28.)   Ms. Martinez Santana declares that she went on the family trip to the Tuxpan Lagoon.  (Id.) She states that once everything was set up, the children, including V.R.S., went into the water, while the adults prepared the food.  (Id.)  She states that the children returned

from the lagoon and all of them seemed happy, including V.R.S. (Id. at 29.) According to Ms. Martinez Santana, after the meal, the children went back into the water and the Relator played in the water with the kids. (Id.) Ms. Martinez Santana attests that she never saw Relator get close to V.R.S. in the water. (Id.)

In March 2020, Ms. Martinez Santana declares she ran into her aunt, Adela, who told Ms. Martinez Santana that Relator had raped Adela's oldest daughter, Kenia, but Adela said nothing about V.R.S. (Id.) In June 2020, according to Ms. Martinez Santana, Adela showed up at Jovita's house with rocks and threw one at the house, yelling and told them she would withdraw criminal charges filed against Relator regarding Kenia if Jovita gave Adela her two homes and vehicle. (Id.)

### 3. Declaration of S.S.S.

S.S.S. is the teenage son of Relator and Jovita. (Dkt. No. 41 at 35.) S.S.S. provided a declaration stating the following. In January 2020, S.S.S. was living in Mexico when Relator visited from the United States. (Id.) Relator was recuperating from a stroke that left half of his body paralyzed. (Id.) S.S.S. went to the Tuxpan Lagoon with his family in February 2020. (Id.)

When the family arrived at the lagoon, S.S.S. went in the water but Relator remained next to the barbecue grill. (Id.) When the food was ready, S.S.S. got out of the water and ate, then returned to the water with his brother and Relator. (Id.) Relator taught his sons how to swim in the deeper part of the lagoon. (Id.) S.S.S., his brother, and Relator got out of the water at the same time, changed clothes and went home. (Id.)

After Relator returned to the United States, Adela came to Jovita's house, cussed at them and accused Relator of raping Kenia, Adela's older daughter. (Id.) S.S.S. heard Adela tell Jovita that if Jovita gave her money, Adela would not file a lawsuit with the

1  public prosecutor's office. (Id.) but Adela did not mention V.R.S. (Id.)

### 4. Declaration of Jovita Santana Espinoza

Jovita is Relator's wife and sister to Adela. (Dkt. No. 41 at 40.) Jovita declares that she went on the family daytrip to Tuxpan Lagoon in February 2020. (Id.) Her declaration further states the following. When everyone arrived at the lagoon, the adults set up and the children went into the water. (Id.) Relator and Jovita set up the firepit to the cook the hamburger patties. (Id.) When the food was ready, the children came out of the water and the adults served the food. (Id.) After eating, the children went back into the water. (Id.) Then, Jovita and Relator also went into the water. (Id.)

Jovita never saw Relator near V.R.S. (Id. at 41.) Jovita remembers that V.R.S. stayed in the shallow, waist high part of the water, while Relator and their sons were in the deeper area. (Id. at 40-41.) After swimming, they changed into dry clothing and drove back to Jovita's house. (Id. at 41.) The adults continued to socialize and the children, including V.R.S., played together. (Id.)

### 5. Declaration of Elfega Manjarrez

Ms. Manjarrez is Relator's sister-in-law and the sister of Jovita and Adela. (Dkt. No. 41 at 46.) Ms. Manjarrez declares that she has known Relator for nearly two decades and that he is kind, humble, respectful, responsible and loving with his family. (Id.) She declares that Adela is emotionally unstable and envious. (Id.) Ms. Manjerrez states that Adela lies to get money and never pays people back. (Id.) According to Ms. Manjarrez, in March 2020, she was present at her mother's house when Adela visited their parents, crying, and Adela told them that Relator had abused Adela's oldest daughter Kenia. (Id.) Ms. Manjarrez states that she does not believe the accusations against Relator because he is a good person and Adela cares about money more than

anything.  (Id.)

### 6. Declaration of Jose Leonardo Santana Santana

Mr. Santana is Relator's father-in-law, the father of Adela and Jovita, and the grandfather of V.R.S.  (Dkt. No. 41 at 49.)  He declares that several years ago, Adela came to his home while Jovita was there and accused Relator of having sexually abused Adela's oldest daughter, Kenia, when Kenia was seven years old.  (Id.)  Mr. Santana states he was previously unaware of the accusations against Relator regarding V.R.S. and does not believe them.  (Id.)

### 7. Declaration of Victor Gomez

According to his declaration, Mr. Gomez is an investigator with the Office of the Federal Public Defender for the Central District of California and is fluent in English and Spanish.  (Dkt. No. 41 at 52.)  He declares that he interviewed Liboria Espinoza Abarcia, V.R.S.'s maternal grandmother, via a video call on January 11, 2025.  (Id.)  According to Mr. Gomez, Ms. Espinoza Abarca knew nothing about the allegations V.R.S. made against Relator and does not recall Adela visiting her and telling her that Relator abused V.R.S. or Kenia.  (Id.)

### 8. Declaration of Pedro Santana

According to his declaration, Pedro Santana is Relator's brother-in-law, the brother of Adela and Jovita, and is V.R.S.'s uncle.  (Dkt. No. 41 at 53.)  He states that he does not believe the allegations against Relator.  (Id.)  Pedro declares that his sister Adela is manipulative, disrespectful, untrustworthy and causes problems.  (Id.)  Pedro states Adela borrowed money from him and never paid him back and that he suspects Adela is keeping money from their elderly parents' pension.  (Id.)

## IV. STANDARD FOR CERTIFICATION OF EXTRADITION

Extradition is a diplomatic process, which begins when a foreign nation requests an accused individual be delivered from the United States to answer for an alleged crime. Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008) (citing Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir.2005)). The extradition request is made to the State Department, which determines whether the request is within the scope of a treaty between the requesting nation and the United States. Id. If the request is within the scope of a treaty, a United States Attorney files a complaint in federal district court seeking an arrest warrant for the requested individual. Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005) (citing Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1207 (9th Cir.2003)). "After the United States has sought an arrest warrant for the person to be extradited (known as the "relator"), a federal or state judicial officer must hold a hearing to determine whether to certify the relator for extradition." Patterson v. Wagner, 785 F.3d 1277, 1279 (9th Cir. 2015) (citing 18 U.S.C. § 3184).

"For the Court to certify [Relator] as extraditable, the Government must establish that (1) the extradition judge has jurisdiction to conduct proceedings; (2) the extradition court has jurisdiction over the fugitive; (3) the extradition treaty is in full force and effect; (4) the crime falls within the terms of the treaty; and (5) there is competent legal evidence to support a finding of extraditability." In re Extradition of Rana, 673 F. Supp. 3d 1109, 1124 (C.D. Cal. 2023) (citing Manta, 518 F.3d at 1140; Zanazanian v. United States, 729 F.2d 624, 625-26 (9th Cir. 1984)) (cleaned up). Under the fifth factor, courts consider whether competent legal evidence demonstrates probable cause to believe the accused committed the crime charged by the foreign nation. Manta, 518 F.3d at 1140.

1  "In addition to its probable cause determination, the Court must also assess whether
2  any of the applicable treaty provisions bar extradition of the alien for any of the charged
3  offenses." Id. (citing Barapind v. Reno, 225 F.3d 1100, 1105 (9th Cir. 2000); Patterson,
4  785 F.3d at 1280) (cleaned up).

5  The extradition court must certify the relator as extraditable if it finds the
6  following: (1) the crime is extraditable and (2) probable cause exists to sustain the
7  charge. Manta, 518 F.3d at 1140. Upon certification by the court, the Secretary of State
8  "ultimately determines whether to extradite the accused to the requesting state."
9  Martinez Santoyo v. Boyden, 130 F.4th 784, 788 (9th Cir. 2025). The magistrate judge
10 "does not weigh conflicting evidence and make factual determinations but, rather,
11 determines only whether there is competent evidence to support the belief that the
12 accused has committed the charged offense." Quinn v. Robinson, 783 F.2d 776, 815 (9th
13 Cir. 1986). "Extradition hearings are not trials, mini trials, nor dress rehearsals for trial.
14 Rather, they are designed only to trigger the start of criminal proceedings against an
15 accused; guilt remains to be determined in the courts of the demanding country."
16 Martinez Santoyo, 130 F.4th at 788 (cleaned up). "Foreign states requesting extradition
17 are not required to litigate their criminal cases in American courts." Santos, 830 F.3d at
18 991.

19 **V.    DISCUSSION AND FINDINGS**

20    **A.    Jurisdiction**

21 Relator does not contest the Court's jurisdiction over this matter or personal
22 jurisdiction over Relator. (Opp., Dkt. No. 41 at 11-12). This Court has jurisdiction to
23 conduct extradition proceedings pursuant to 18 U.S.C. section 3184, Local Rule 72-1,
24 and General Order No. 05-07 of the United States Court for the Central District of

California. The Court has personal jurisdiction over Relator because he was arrested on the extradition warrant in Orange County on July 11, 2024. Therefore, he was found within the Court's jurisdiction.  See 18 U.S.C. § 3184 ("magistrate judge….may, upon complaint made under oath, charging any person found within his jurisdiction, … issue his warrant for the apprehension of the person so charged, that he may be brought before such… magistrate judge, to the end that the evidence of criminality may be heard and considered."); United States v. Perilla Umbarila, 562 F. Supp. 3d 729, 735 (C.D. Cal. 2022) ("Court has jurisdiction over a fugitive found within its jurisdictional boundaries.")  The Court finds that subject matter jurisdiction and personal jurisdiction exist here.

**B.      Valid Extradition Treaty**

There is no dispute regarding the existence of a valid extradition treaty, in full force and effect, between Mexico and the United States.  (Opp., at 12.)  The Government has provided a declaration from Tom Heinemann, an attorney in the Office of the Legal Adviser for the Department of State, attesting that the extradition treaty between the United States and Mexico is in full force and effect. (Dkt. No. 27-1 at 2.) The Court defers to the Department of State's determination in this regard. See, e.g., Then v. Melendez, 92 F.3d 851, 853 (9th Cir. 1996).  The Court finds that a valid extradition treaty is in full force and effect.

**C.      Extraditable Offense**

Relator does not contest that the crime of sexual abuse is an extraditable offense. (Opp. at 12.)  The Government has established that the alleged crime of sexual abuse is extraditable under the extradition statute and the Treaty.  (Dkt. No. 27-1 at 23-25, Dkt. No. 27-2 at 6, 22, Dkt. No. 31 at 24.)  The Court finds that the alleged offense is

extraditable.

### D. **Probable Cause**

The only issue before the Court is whether probable cause exists that Relator committed the alleged crime. The alleged crime is sexual abuse pursuant to Article 180 of the Criminal Code of the State of Guerrero, which consists of the following elements: (1) whoever performs a sexual act on another person, (2) without consent of the person, and (3) without the purpose of copulation. (Dkt. No. 27-3 at 6-7.)

The Government argues that evidence submitted with the extradition request establishes probable cause that Relator committed sexual abuse against V.R.S. (Govt. Memo, Dkt. No. 31 at 26.) The Government contends that V.R.S.'s declaration, attesting that Relator grabbed V.R.S.'s leg under the water, put his hand inside her shorts and fondled her vagina, along with her parents' corroborating declarations and the Psych Report showing emotional damage, establish probable cause. (Id.) Further, the Government argues that V.R.S.'s statement establishes probable cause for the elements of sexual abuse because it is clear from her testimony that she did not consent to Relator performing a sexual act on her, and that Relator did not intend copulation. (Id.)

In opposition, Relator argues that probable cause does not exist. Relator contends that the declarations he proffers, which impeach Adela's character and state that Adela initially accused Relator of raping her oldest daughter Kenia, "obliterate" Adela's credibility. (Opp., Dkt. No. 41 at 16.) According to Relator, Mexico's evidence cannot establish probable cause because Mexico's investigation was inadequate. (Id.) Relator argues that the declarations of others who were present at the lagoon show a different timeline of events than V.R.S.'s declaration. (Id. at 16-17.) Lastly, Relator challenges the competency of V.R.S.'s declaration to establish probable cause because of

purported inconsistencies in her story and a lack of corroboration.  (Id. at 20-22.)

In reply, the Government contends that Relator's arguments and evidence fail to undermine the probable cause showing because Relator's proffered evidence is contradictory, a relator cannot attack the credibility of the requesting country's declarant, and alleged contradictions or inconsistencies in V.R.S.'s statement do not destroy probable cause. (Reply, Dkt. No. 50 at 8-9.)

The probable cause standard under the extradition statute is the same requirement as the familiar domestic criminal standard. Compare 18 U.S.C.A. § 3184 ("the evidence sufficient to sustain the charge") with Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (evidence sufficient to warrant a prudent man in believing that the suspect has committed the offense).  At the extradition hearing, the probable cause inquiry is analogous to that of a preliminary hearing in a criminal setting.  Santos, 830 F.3d at 991. "Probable cause 'is not a high bar.'" District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)).  Probable cause exists when a prudent person would conclude there is a fair probability the suspect had committed the crime.  United States v. Ortiz-Hernandez, 427 F.3d 567, 573 (9th Cir. 2005).

The Government has established probable cause.  V.R.S.'s declaration is "competent evidence to support the belief that [Relator] has committed the charged offense." See Quinn, 783 F.2d at 815. Contrary to Relator's arguments, a lack of credibility or inconsistencies in Mexico's witness statements do not obliterate probable cause but are "merely a weakness" in Mexico's case.  See Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008) (lack of credibility of requesting country's witness does not obliterate probable cause and evidence impeaching witness's credibility is not

1  admissible); Quinn, 783 F.2d at 815 ("[Relator] contends that because of these

2  irregularities the evidence is unreliable and cannot be considered 'competent,' . . . and

3  that it thus cannot support the probable cause finding. We disagree.")

4        Relator's proffered evidence does not defeat the Government's showing. The

5  credibility and fact determinations that Relator implicitly asks the Court to make are

6  outside the well-established scope of an extradition hearing. See Santos, 830 F.3d at 993

7  ("an individual contesting extradition may not . . . call into question the credibility of the

8  government's offer of proof"); Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005)

9  (en banc) (extradition courts do not weigh conflicting evidence in making their probable

10 cause determinations); In Matter of Extradition of Azizi, No. 5:14-XR-90282 PSG, 2015

11 WL 1299791, at *3 (N.D. Cal. Mar. 20, 2015) ("attacks on credibility, evidence

12 establishing a defense to the merits of the charges, and evidence that does not accept the

13 requesting country's evidence as true are considered 'contradictory,' not 'explanatory,'

14 evidence" and thus impermissible in extradition hearings). The Court finds probable

15 cause exists to support certifying the extradition of Relator.

16 **VI.**   **CONCLUSION**

17       For the reasons discussed above, the Court will issue a separate order certifying

18 Prudencio Segura Castillo for extradition to Mexico on the charges of sexual abuse

19 against V.R.S.

20       IT IS SO ORDERED.

21 Dated: 4/16/2025

22

23                                /s/ Autumn D. Spaeth
                            THE HONORABLE AUTUMN D. SPAETH
                            United States Magistrate Judge

24